## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GRUNLEY CONSTRUCTION COMPANY, INC.   )
15020 Shady Grove Road, Suite 500         )
Rockville, MD 20850                         )
                                         )

       **Plaintiff,**                  )

**v.**                                     )

**OHIO CASUALTY INSURANCE COMPANY**   )
62 Maple Avenue                      )    **CIVIL ACTION NO.**
Keene, NH 03431                     )
                                         )
<u>SERVE ON</u>:                         )
Chester McPherson                  )
Attn: Michelle Mathis               )
Department of Insurance, Securities and Banking   )
810 1ˢᵗ Street, NE, Suite 701               )
Washington, DC 20002                )
                                         )

       **Defendant.**               )

## COMPLAINT

      Grunley Construction Company, Inc. ("Grunley"), by counsel, for its complaint against

Ohio Casualty Insurance Company ("OCIC"), hereby states as follows:

## NATURE OF THE ACTION

      1.     This is an action for breach of a performance bond brought by Grunley against

OCIC.

## PARTIES

      2.     Grunley is a construction company incorporated in Maryland with its principal

office in Rockville, Maryland.

      3.     On information and belief, OCIC is a corporation organized and existing under

the laws of the State of New Hampshire, with its principal place of business located in the State

of New Hampshire.

## JURISDICTION

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest, fees, and costs.

5.     Venue is proper in this judicial district under 28 U.S.C. § 1391, in that Grunley does business in this district and division, and a substantial part of the events giving rise to the claims at issue in this case took place in this judicial district.

## FACTUAL ALLEGATIONS

6.     In 2014, Grunley entered into a prime contract (the "Prime Contract") with Euro Capital Properties, LLC ("Owner") to renovate the Watergate Hotel, which is located in the Foggy Bottom neighborhood of Washington, D.C. (the "Project").

7.     On or about May 6, 2014, Grunley and Perdomo Construction and Management Services, LLC ("Perdomo") entered into a written subcontract (the "Subcontract"), whereby Perdomo agreed, among other things, to provide "[a]ll labor, material, and equipment necessary to complete the demolition, excavation, and erosion and sediment control work" on the Project. The original price of the Subcontract was $710,500.00.  A true and correct copy of the Subcontract is attached hereto as Exhibit A.

8.     On or about June 4, 2014, OCIC, as surety, issued a Performance Bond, No. 017-156-642, on behalf of Perdomo, as principal, and in favor of Grunley, as obligee (the "Performance Bond").  A true and correct copy of the Performance Bond is attached hereto as Exhibit B.  In the Performance Bond, OCIC guaranteed the performance of its principal, Perdomo, under the Subcontract, and agreed that it will "indemnify and save harmless [Grunley] of and from any and all loss, damage, and expense, including costs and attorney's fees for up to

two (2) years from final completion, which [Grunley] may sustain by reason of failure so to do . . . ." *Id.*

       9.     The terms of the Subcontract are expressly incorporated into the Performance Bond by reference.

      10.    Under the express terms of the Subcontract, Perdomo covenanted and agreed to diligently and continuously prosecute and complete the work required by the Subcontract. Specifically, Article 25 of the Subcontract provides, in pertinent part: "The Subcontractor shall employ at all times a sufficient number of workmen with sufficient equipment and proper materials which in the opinion of the Contractor shall be required to prosecute the Work in a diligent and expeditious manner." (Exhibit A, Subcontract, Article 25). Additionally, Article 10 of the Subcontract provides as follows:

> Time is of the essence with respect to the Subcontractor's performance of the work and Subcontractor's compliance with the terms and conditions of the Subcontract. The Contractor has the right to direct the manner in which the Subcontractor performs its work. Subcontractor shall proceed with the performance of the work at such time and in such sequence as the Contractor may direct and/or as required by the Schedule of Progress, which may be updated and revised from time to time by the Contractor as working conditions require, including overtime or shift work performance as necessary. If overtime or additional shifts are required solely to accelerate project completion through no fault of the Subcontractor, it shall be authorized in writing prior to such acceleration effort and be paid for by the Contractor. Payments due may be withheld to ensure timely progress and completion of work. The Subcontractor shall be liable for all losses and damages incurred by the Contractor (including consequential damages and legal fees) due to inexcusable delays of the Subcontractor in the performance of the work, including delay costs not reimbursable from the Owner due to concurrent, inexcusable delays of the Subcontractor.

(Exhibit A, Subcontract, Article 10).

      11.    Under the express terms of the Subcontract (which are incorporated by reference into the Performance Bond), Perdomo covenanted and agreed that Grunley would be entitled to

take certain steps to ensure that defective work under the Subcontract would be corrected.  In this

regard, Article 15 of the Subcontract provides, in relevant part:

> Rejection by Contractor of any or all parts of defective work for failure to conform with
> the Subcontract shall be final and binding.  Such rejected work shall promptly be
> corrected or replaced by Subcontractor at Subcontractor's expense.  If Subcontractor fails
> to commence and diligently continue correction or replacement of such rejected work
> within forty-eight (48) hours, after receipt of written notice from Contractor to correct or
> replace the rejected work, Contractor may at its option remove and replace the rejected
> work and Subcontractor shall promptly reimburse Contractor for the costs of such
> removal and replacement of defective work.

(Exhibit A, Subcontract, Article 15).

12.     Under the express terms of the Subcontract (which are incorporated by reference

into the Performance Bond), Perdomo covenanted and agreed that Grunley would be entitled to

take certain steps to ensure the completion of the Subcontract work in the event of a default by

Perdomo with respect to its obligations under the Subcontract and upon three (3) days notice of

such default by Grunley.  In this regard, Article 14 of the Subcontract provides in part:

> The following events determined by the good faith judgment of the Contractor
> shall be deemed a breach of this Agreement by the Subcontractor:  failure to
> expeditiously prosecute and complete the whole or any part of the Work in
> accordance with the current Schedule of Progress and/or directions from the
> Contractor; failure to pay for labor and material, payroll taxes, contributions, or
> insurance premiums; interference with the performance of work by others for any
> reason; an act of bankruptcy or insolvency; or any other material failure to fulfill
> obligations of this Subcontract or of the Prime Contract concerning the
> Subcontractor's work or responsibilities.  If the Subcontractor breaches the
> Subcontract, Contractor shall have the right, after three (3) days written notice to
> the Subcontractor, in addition to any other rights and remedies provided by this
> Agreement, the other Contract Documents or by law:  (a) to perform and furnish
> under this Agreement, and/or (b) to terminate the employment of the
> Subcontractor for all or any portion of the Work, enter upon the premises and take
> possession, for the purpose of completing the Work, of all materials, equipment,
> scaffolds, tools, appliances, and other items thereon, all of which the
> Subcontractor hereby transfers, assigns, and sets over to Contractor for such
> purpose, and to employ any person or persons to complete the Work and provide
> all the labor, services, materials, equipment, and other items required therefore.
> In the event that the Contractor believes in good faith that the work is being
> endangered by the Subcontractor's failure to prosecute the work or take action,

such written notice may be omitted and the Contractor may immediately take the actions set forth in this Article 14.

In case of termination of the employment of the Subcontractor, the Subcontractor shall not be entitled to receive any further payment under this Agreement until the Work is completed to the satisfaction of Contractor and the Owner.  If the unpaid balance of the amount to be paid under this Agreement exceeds the cost and expense incurred by Contractor in completing the Work, such excess shall be paid by Contractor to the Subcontractor; but if the cost and expense to complete the Work exceeds the unpaid balance, then the Subcontractor and its surety shall pay the difference to Contractor.  Such cost and expense shall include:  i) the cost of performing and furnishing all labor, services, materials, equipment and other items required to complete the Work to the satisfaction of Contractor and the Architect, ii) all losses, damages, costs, and expenses (including legal fees and disbursements incurred in connection with reprocurement, in defending claims arising from such default and in seeking recovery of all such cost and expense from the Subcontractor and/or its surety), and iii) all liquidated damages and other disbursements sustained, incurred, or suffered by reason of or resulting from the Subcontractor's default.  Contractor does not waive any other rights or remedies available to the Contractor, including right of setoff and collection of any funds which may be due Subcontractor under other subcontracts with the Contractor.  If the Contractor wrongfully exercises its default option under this Article, the Subcontractor's remedy shall be solely and exclusively under Article 29, Termination for Convenience.

(Exhibit A, Subcontract, Article 14).

13.     Beginning in approximately August of 2014, serious problems with Perdomo's performance under the Subcontract began to surface.  For instance, Perdomo began to improperly staff the Project; Perdomo stopped paying its workers regularly; Perdomo's progress began to slow, even when the Project was properly staffed; and Perdomo began to ignore directives from Grunley.

14.     By e-mail dated September 3, 2014, Grunley advised Perdomo as follows:

The purpose of the daily onsite meetings you agreed to attend is to specifically help Perdomo be successful in the execution of its remaining work.  To ensure you, Orlando Perdomo, have the ability to convey to Grunley daily what your needs are to ensure you remain productive and meet your commitment of completing the Ballroom on Friday, 9/5/2014.  Grunley also communicates our needs at this meeting to ensure you, Orlando Perdomo, know the work you need to focus on and know of any coordination with others.

We have struggled with communication to date and this meeting would ensure no further struggles and help you to be successful. Today you skipped the meeting, were not on site for the day as you said yesterday that you would be and have been unreachable on your phone when Mr. Hager and I have called you.

Your current status in the attached photo does not represent sufficient progress to indicate the work will be completed by Friday as committed. If the work is not finished, we will supplement your efforts. We would rather you complete your work as promised and not take that course of action. Grunley is on site and ready to help you make this commitment.

15.     By letter dated September 7, 2014, Grunley sent to Perdomo a "cure notice,"

stating:

The ballroom demolition work by Perdomo Construction and Management Services, LLC (Perdomo) began on August 11, 2014. Exhibit D of your subcontract requires this work to be completed in 8 workdays. Following numerous delays, Grunley requested an update on August 28, 2014 and Perdomo advised the work would be completed no later than Friday, 09/05/2014. The attached photos show the work remains incomplete as of 09/06/2014.

In accordance with Article 14, Default Termination, your subcontract agreement and the attached email notification sent on 09/03/2014, this letter is notification that Perdomo has three (3) days to cure its default starting on 09/06/2014 or Grunley shall take remedial actions within the terms of the subcontract agreement.

16.     Despite Grunley's letter of September 7, 2014, Perdomo did not cure its defective

and untimely performance.

17.     On September 9, 2014, Grunley supplemented Perdomo's tardy and defective

demolition work in the ballroom and kitchen area of the Project due to unsafe conditions created

by Perdomo.

18.     Between August 26, 2014 and September 16, 2014, Perdomo failed to renew its

insurance premiums.

19.     Perdomo was supposed to commence demolition of the Elevator #7 area on

September 10, 2014 and this work was to be completed by September 19, 2014. However,

Perdomo failed to commence demolition of the Elevator #7 area on time and, therefore, Grunley was forced to supplement Perdomo's demolition on September 18, 2014.

20.     On September 18, 2014, Perdomo performed certain demolition work at the Project. However, the demolition work performed on September 18, 2014 left openings between the concrete slabs and Perdomo did not put in place temporary "fall protections." This rendered the Project site unsafe.

21.     At Perdomo's direction, one of Perdomo's subcontractors showed up to the Project site on September 19, 2014 to cut concrete slabs associated with the restaurant area of the Project. However, Perdomo never advised Grunley that it had scheduled this work and, thus, Grunley could not allow this unsanctioned and unsafe work to take place. In fact, Perdomo did not even submit a demolition plan for this work until September 22, 2014 – i.e., after the date on which Perdomo attempted to have the work performed.

22.     By letter dated September 23, 2014, Grunley sent to Perdomo and OCIC a Notice of Termination for Default letter, advising that Perdomo "is hereby terminated for default for repeatedly failing to proceed timely in accordance with the scheduling requirements of the project and failing to provide the requisite manpower." The letter also described numerous instances of Perdomo's defective and untimely work and listed the following items in Perdomo's scope of work that remain incomplete:

- Topping slab demolition at the Ground and B-1 levels remains incomplete;
- Demolition of rain leaders and HVAC piping on floors B-3 through Ground remain incomplete;
- Debris from the 7th floor balcony demolition remains on the 7th floor and demolition work in this area remains incomplete;
- Clean up of demolition debris throughout floors 14 through B3 remains incomplete;
- Sediment and erosion controls remain incomplete;
- Maintenance at installed inlet protection remains incomplete;

- Clearing and grubbing at the north side of the Project site remains incomplete; and
- Removal of outstanding top soil at the ballroom area of the Project remains incomplete.

23.     To date, Perdomo has failed to honor its obligations under the Subcontract and OCIC has failed to honor its obligations under the Performance Bond, including those obligations expressly imposed on OCIC by the Subcontract, which the Performance Bond incorporates by reference.

24.     As a result of OCIC's (and Perdomo's) default, Grunley has incurred and will continue to incur damages, including completion, administrative, overhead, and other costs, interest, and attorneys' fees.

25.     Grunley has performed all the terms and conditions required of it under the Subcontract and the Performance Bond and/or is otherwise excused from its performance obligations because of Perdomo's breaches of its obligations to Grunley and/or OCIC's breaches of its obligations to Grunley.

## COUNT I.

### Breach of Performance Bond Against OCIC

26.     The allegations in the foregoing Paragraphs are incorporated herein by reference as if fully stated herein.

27.     OCIC and Perdomo issued a Performance Bond whereby OCIC and Perdomo each agreed, among other things, to hold Grunley, as obligee, harmless up to at least $710,500.00, from any and all costs, damages, expenses and attorneys' fees, which Grunley may sustain by reason of Perdomo's failure to well and truly perform all the undertakings, covenants, terms, conditions and agreements of the Subcontract.  OCIC and Perdomo are jointly and severally liable under the Performance Bond.

8

28.    OCIC was informed timely of Perdomo's default under the Subcontract and failed or refused to cure the default.

29.    OCIC has failed to perform its obligations under the Performance Bond.

30.    OCIC's failure to perform its obligations under the Performance Bond constitutes a breach of contract.

31.    OCIC's failure and refusal to perform its obligations under the Performance Bond constitutes a breach of its duty of good faith and fair dealing.

32.    Grunley performed all the terms and conditions required of it under the Subcontract and the Performance Bond and/or is otherwise excused from performance because of Perdomo's breach of its obligations to Grunley and/or OCIC's breach of its obligations to Grunley.

33.    As a result of OCIC's breach, Grunley has suffered, and will suffer, substantial damages, in excess of $909,652.00.

34.    Grunley is entitled to an award of interest, costs and attorneys' fees against OCIC.

**WHEREFORE,** Grunley demands judgment in its favor and against OCIC for all damages, costs and expenses, including attorneys' fees incurred by Grunley as a result of OCIC's failure to perform and OCIC's breaches, and for such further and different relief as the Court deems just and proper.

Dated:  June 2, 2015                              Respectfully submitted,

/s/ Robert J. Symon
Robert J. Symon (DC Bar No. 436245)
Bradley Arant Boult Cummings LLP
1615 L Street, N.W., Suite 1350
Washington, DC 20036
Telephone: (202) 719-8294
Facsimile:  (202) 719-8394
*Counsel for Grunley Construction Company, Inc.*